UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

LOU BRANDON and HILLARY WRIGHT,

                              Plaintiffs,

         -against-

THE CITY OF NEW YORK; MAYOR BILL DE BLASIO; NEW YORK
CITY POLICE DEPARTMENT ("NYPD") COMMISSIONER DERMOT
SHEA; NYPD CHIEF OF DEPARTMENT TERENCE MONAHAN; NYPD
POLICE OFFICER DAVID JOHNSON, and NYPD MEMBER DOES 1-14,

                              Defendants.

--------------------------------------------------------------------------------X

Case No.:

**COMPLAINT AND
JURY DEMAND**

ECF CASE

Plaintiffs, LOU BRANDON and HILLARY WRIGHT, by their attorneys, COHEN&GREEN

P.L.L.C., hereby complain of Defendants as follows:

## PARTIES, VENUE AND JURISDICTION

1.      At all times mentioned herein, Plaintiff, LOU BRANDON (they/them), was a

resident of Bronx County in the City and State of New York; Plaintiff HILARY WRIGHT

(she/her) was a resident of Kings County, New York.

2.      The events described in this complaint took place on the night of January 18,

2021—Dr. Martin Luther King, Jr. Day—into the early morning of January 19, 2021, in and around

City Hall Park in the County, City, and State of New York.

3.      At all relevant times mentioned herein, Defendant, City of New York ("New York

City"), was and is a municipal corporation duly organized and existing under and by virtue of the

laws of the State of New York and acts by and through its agencies, employees and agents,

including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

4.     Defendant New York City Mayor BILL DE BLASIO was at all times relevant to this Complaint the Mayor of New York City. As Mayor, Defendant de Blasio, at all relevant times, was an elected officer and the "chief executive officer of the city," NYC Charter Section 3, and had final authority to appoint and/or remove the New York City Police Commissioner. He is sued individually and in his official capacity.

5.     Defendant NYPD Commissioner DERMOT SHEA was at all times relevant to this Complaint the Police Commissioner of the NYPD. As Police Commissioner, Defendant Shea, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. He is sued individually and in his official capacity.

6.     Defendant NYPD Chief of Department TERENCE MONAHAN was at all times relevant to this Complaint the Chief of Department of the NYPD who had policymaking authority over the Department. At all relevant times, as Chief of Department, Defendant Monahan, had primary responsibility for NYPD operations—that is, for the police response on the street. Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service were obligated to obey any lawful order given by him. He is sued individually and in his official capacity.

7.     At all times hereinafter mentioned, the Defendant NYPD members were employed by the City of New York as members of the NYPD (and hereafter are referred to, together and collectively with named entities, as "Defendants").

8.     At all times hereinafter mentioned, Defendant Police Officer David Johnson's badge number is 10132, his tax ID is 956776, and he is a member of the NYPD's Strategic Response Group.

9.     The true names of Defendant Does 1-14, as noted throughout this Complaint, are currently unknown to the Plaintiffs. Defendant Doe #3 appeared to be a white woman with blonde hair of short stature and heavyset build. Defendant Doe #4 appeared to be a white man with dark hair of average height and slim build. Defendant Doe #10 appeared to be a Black woman with her hair in braids.

10.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

11.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

12.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

13.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional

policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

14.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

15.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

16.     Each individual Defendant is sued in her or his individual and official capacities.

17.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

18.     Venue is proper pursuant to 28 U.S.C. § 1391, et seq., in the Southern District of New York, where Plaintiff Brandon and Defendant City of New York reside and where the actions complained of herein by both Plaintiffs occurred.

19.     Plaintiff BRANDON timely served a Notice of Claim on the municipal Defendant and complied with all conditions precedent to commencing an action under state law.

20.     At least thirty days have elapsed since service of Plaintiff BRANDON's Notice of Claim and adjustment and payment thereof has been neglected or refused.

21.     On April 13, 2022, Plaintiff WRIGHT initiated a proceeding seeking leave to file a Notice of Claim out of time (Index No. 153226/2022), including on the basis that the Comptroller had actual notice of this claim by virtue of the other Notices of Claim and lawsuits related to this

incident that were timely filed, including the Notice of Claim of Plaintiff Brandon, and the index number remains unassigned. That proceeding is pending.

22.    This action has been initiated within one year and ninety days of the accrual of Plaintiffs' claims pursuant to New York State Law.

## STATEMENT OF FACTS

### PROTESTS IN SUPPORT OF BLACK LIVES

23.    On May 25, 2020, police killed George Floyd. Protests against police violence and in support of police accountability and the Black Lives Matter movement immediately spread across the United States and the world, including here in New York City where thousands exercised their constitutional rights to protest. These protests were also countered with pro-police demonstrations and "Blue Lives Matter" protests.

24.    In the weeks and months following Floyd's murder, the New York City Police Department ("NYPD") engaged in activities that violated the constitutional rights of individuals who were protesting police misconduct and gathering to voice support for the lives, rights, and civil liberties of Black people, including, *inter alia,* corralling protestors into spaces where they could not escape, beating protestors with batons and fists, throwing protestors to the ground, using pepper spray indiscriminately, and ultimately arresting many of the protestors without lawful justification and without fair warning. Protestors were physically restrained with flex-cuffs in such a manner that caused them unnecessary pain and suffering and, in some cases, possible serious and long-term nerve damage. They were also subjected to lengthy and unnecessary arrest processing that put them in dangerously close quarters, all at the height of the global COVID-19 pandemic.

25.    The unlawful policies and practices used by Defendants against protestors included a crowd-control tactic known as "kettling" to corral and detain individuals who were engaged in

peaceful protest. Protestors who were subjected to kettling were unable to move to avoid police contact, despite often simultaneously being given orders to move or disperse.

26.     Defendants used these tactics as well as assault, battery, physical intimidation, sexual harassment and gender-based abuse, mass arrests, and threats in order to impede constitutionally protected First Amendment activities, to conduct detentions without probable cause, and to deter those arrested and beaten, and others, from exercising their First Amendment rights in the future.

27.     In addition, NYPD officers also targeted and arrested legal observers, medics, and other workers performing essential services without probable cause.

28.     By contrast, these same Defendants have responded to other protests (including, in particular, "Blue Lives Matter" and other pro-police and/or rightwing protests) without using the same tactics employed against those who protested police conduct during the racial justice protests of 2020—instead targeting counter-protestors at these events.

29.     The police actions in this case were part of overlapping policies and practices of the City of New York and the NYPD which were well known to Defendants New York City Mayor Bill de Blasio, New York City Police Commissioner Dermot Shea, and other City policymakers. These overlapping policies and practices include, *inter alia,* the use of excessive force, false arrests, sexual battery and harassment, and excessive and unreasonable detention at certain demonstrations—particularly those that focus on misconduct by the NYPD—but not others.

30.     These overlapping policies and practices have existed for years and have often resulted in litigation.

31.     The events in this complaint took place in January 2021 at a gathering in support of Black lives that took place, intentionally, on January 18: Dr. Martin Luther King, Jr. Day.

## PLAINTIFFS' EXPERIENCES

### Plaintiff Lou Brandon

32.     Lou Brandon is a Black nonbinary person who uses they/them pronouns.

33.     On the evening of January 18, 2021, they participated in a demonstration in honor of Dr. Martin Luther King, Jr. and in support of Black lives.

34.     They joined a planned rally at the Barclays Center in Kings County, New York, where several speakers addressed the crowd and gave speeches. They arrived around 7:30PM.

35.     Shortly thereafter, Plaintiff and other attendees marched across the Brooklyn Bridge to City Hall in Manhattan, New York County. They then gathered on the sidewalk and public spaces outside of City Hall.

36.     Upon their arrival at City Hall, at approximately 9PM, the group was immediately surrounded by members of the NYPD. Demonstrators were being forced by the NYPD off the sidewalk and into the street to be arrested. Plaintiff was also pushed by Defendant John Doe #1 while attempting to remain on the sidewalk. Defendant John Doe #2 was raising a baton and brandishing it at demonstrators.

37.     NYPD members positioned metal, railed police barricades on sidewalks so that the barricades functionally split the public sidewalk into two; one side of the sidewalk was between the barricade and buildings, fencing, or other non-street areas, and the other side was between the barricade and the street. The NYPD was arresting demonstrators for being on the "wrong" side of the barricade, the street-adjacent side which was still part of the public sidewalk, while also preventing demonstrators from moving over or between the barricades to the further side. As is common during NYPD responses to these demonstrations, the NYPD was issuing orders and simultaneously preventing demonstrators to complying with them.

38.     Plaintiff felt they could not safely leave the area given that they were surrounded by NYPD members with no safe path of egress.

39.     Plaintiff was on the public sidewalk caught between the street, where members of the NYPD were gathered, and the metal barricade. They were attempting to assist another demonstrator in crossing the barricade from the street-adjacent side of the sidewalk to the far side of the sidewalk. Defendant Jane Doe #3 then grabbed Plaintiff's companion's backpack. Defendant John Doe #4 assisted Jane Doe #3 in pulling Plaintiff and their companion off of the sidewalk and into the street and throwing them to the ground.

40.     Plaintiff was then surrounded, while still on the ground, by at least Defendant Does 3-9 while at least two of these Does kneeled on them and put pressure on their back and neck. At least one Defendant Doe knocked off Plaintiff's glasses, and another tore their jacket. At least one Defendant Doe struck Plaintiff in their head. They were thrown to the ground with such force that their chest began to hurt, and they had difficulty breathing. At least Does 3-9 participated in dragging them across the pavement, causing an injury to their knee, and placing themselves between Plaintiff and onlookers who were attempting to record the abuse. Bystanders screamed that Plaintiff was unable to breathe because they were in obvious distress, but Defendant Does continued to assault them.

41.     At least one of Does 1-9 placed Plaintiff in extremely tight plastic zip-tie handcuffs, cutting off circulation to Plaintiff's hands and causing significant pain. Defendant Does 1-9 used unreasonable and excessive physical force against them.

42.     Plaintiff was then placed into a police van by Defendant Jane Doe #10, who appeared to be a Black woman whose hair was in braids at the time of this incident. Plaintiff

informed Jane Doe #10 that their handcuffs were so tight that they could no longer feel their hands, and they were ignored for roughly 20 minutes.

43.     Before being placed into the van, Plaintiff also gave Jane Doe #10 and other Doe officers present basic information about their identity, including that they use they/them pronouns.

44.     After approximately 20 minutes, at least one Defendant Doe attempted to remove the zip-ties from Plaintiff's wrists, but they had been applied so tightly that this process caused further pain and injury to Plaintiff while Defendant Does struggled to remove them.

45.     Plaintiff then asked the Defendant Does present in the van if they would wear face masks as a precaution against the spread of COVID-19. Defendant Does refused.

46.     Jane Doe #10 responded to Plaintiff's objections about Defendant Does' refusal to properly wear masks by intentionally misgendering Plaintiff and repeatedly using "she" pronouns. This pointed misgendering continued throughout Plaintiff's time in NYPD custody.

47.     Plaintiff was denied any phone call or contact with counsel or any other support while in custody. They were unlawfully deprived of meaningful access to food, water, bathroom, soap and other hygiene products, and other basic necessities for an extended period of time, and subjected to filthy, crowded, and unsanitary conditions of confinement—including undue risk to COVID-19, against which Defendant Does refused to take mandated precautions—while in NYPD custody.

48.     On January 19, 2021, NYPD Member Doe #11 issued Plaintiff two summonses, bearing Summons Numbers 4450092235 and 4450092221, and released them from custody. Their case was ultimately dismissed.

49.     Plaintiff has required both medical and psychological treatment due to their experience.

*Plaintiff Hillary Wright*

50.     Plaintiff Hillary Wright was also present at City Hall Park in Manhattan for the gathering of demonstrators in honor of Dr. Martin Luther King, Jr. on the evening of January 18, 2021.

51.     Like Plaintiff Lou Brandon, Plaintiff Hillary Wright was present for the NYPD's use of sidewalk-splitting barricades and witnessed Defendant NYPD Does pull multiple people from the sidewalk and onto the street for arrest. She herself was also subjected to the NYPD's use of these barricades both as weaponry and as ad hoc justification for police enforcement, assaults, and arrests.

52.      Plaintiff was present at approximately 9PM when members of the NYPD began using the barricades to assault and corral demonstrators.

53.     At least three unidentified Doe officers, Defendant Does #12-14, used a metal barricade to shove and strike Plaintiff, who was standing on the public sidewalk, and the demonstrators beside her.

54.     Without warning, Defendant NYPD Officer David Johnson, Badge # 10132 of Strategic Response Group 2, shoved claimant forcefully to the ground. She landed on her left side, causing significant and lasting pain to her left shoulder and knee.

## SEX- AND GENDER-BASED ABUSE AND MISGENDERING BY MEMBERS OF THE NYPD

55.     Members of the NYPD have repeatedly engaged in gender- and sex-based misconduct, violence, and harassment of civilians,[1] including during responses to protests such as

---

[1] *See* Joshua Kaplan & Joaquin Sapien, *NYPD Cops Cash in on Sex Trade Arrests with Little Evidence, While Black and Brown New Yorkers Pay the Price*, PROPUBLICA, Dec. 7, 2020, *available at*: https://www.propublica.org/article/nypd-cops-cash-in-on-sex-trade-arrests-with-little-evidence-while-black-and-brown-new-yorkers-pay-the-price; *see also* Joaquin Sapein, Topher Sanders & Nate Schweber, *Over a Dozen Black*

Occupy Wall Street and Black Lives Matter demonstrations[2]. This misconduct and violence can be physical and/or verbal and is part of an ongoing refusal on the part of the Department to meaningfully address any of the issues repeatedly raised publicly regarding this abuse by NYPD members.

56.     The Defendants have been on notice about gender-based and sexually-based misconduct by NYPD members and the need for training and discipline around these harms for years, but have failed to address these issues in any meaningful way. In fact, as in the case of Assistant Chief of NYPD Christopher McCormack, members who are accused of such misconduct often rise through the ranks.[3] McCormack has been accused by more than a dozen people of humiliating and abusive sexual conduct, including public strip searches and forcibly inserting his fingers into their anal cavities during legally prohibited "searches."[4]

57.     In 2012, the NYPD was forced to add provisions to its Patrol Guide specifically outlining rules for the treatment of transgender people. These rules included prohibitions against misgendering and/or deadnaming.

58.     However, in a November 2017 report, Review of NYPD's Implementation of Patrol Guide Procedures Concerning Transgender and Gender Nonconforming People, the NYC

---

and Latino Men Accused a Cop of Humiliating, Invasive Strip Searches. The NYPD Kept Promoting Him. PROPUBLICA, Sept. 10, 2020, available at: propublica.org/article/over-a-dozen-black-and-latino-men-accused-a-cop-of-humiliating-invasive-strip-searches-the-nypd-kept-promoting-him; Natasha Lennard, In Secretive Hearing, NYPD Cops Who Raped Brooklyn Teen in Custody Get No Jail Time, THE INTERCEPT, August 30, 2019, available at: https://theintercept.com/2019/08/30/nypd-anna-chambers-rape-probation/.

[2] For example, in Perloff v City of New York et. al, 1:13-cv-04175 (KBF)(S.D.N.Y), Plaintiff Perloff alleged that Defendant NYPD Sergeant Catapano grabbed her breast forcefully and intentionally while arresting her after she initially asked him not to touch her chest. Perloff's suit stated that this conduct was consistent with widespread sexual misconduct by police at the Occupy Wall Street demonstration at which her assault occurred.

[3] See Joaquin Sapein, Topher Sanders & Nate Schweber, Over a Dozen Black and Latino Men Accused a Cop of Humiliating, Invasive Strip Searches. The NYPD Kept Promoting Him. PROPUBLICA, Sept. 10, 2020, available at: propublica.org/article/over-a-dozen-black-and-latino-men-accused-a-cop-of-humiliating-invasive-strip-searches-the-nypd-kept-promoting-him

[4] Id.b

Department of Investigation (DOI) found "clear gaps in NYPD's implementation of and training on the revisions" to the Patrol Guide made in 2012 to establish standards for the treatment of transgender and gender nonconforming people.[5] Consistent with the studies and reports cited in previous paragraphs, the DOI investigation uncovered reports of "officers ignoring preferred names and gender identities, using slurs related to gender identity . . . and refusing to take crime reports from transgender and gender nonconforming individuals."[6] Transgender "people of color in particular reported feeling targeted."

59.    The investigation also revealed that the NYPD failed to train many members of the police force on the Patrol Guide revisions, and that it "has not explained to all officers why the changes were necessary or that they specifically apply to [transgender] people." The report characterized the "reach and impact" of NYPD's in-service training as "inadequate" and found that, over a period of four years analyzed, "only six of NYPD's 77 precincts received" that training.

60.    In addition to inadequate trainings, the report identified additional inadequate policies and practices for ensuring that NYPD officers respect transgender people's rights. With an entire section of the report devoted to how inadequate forms contribute to the continued problem of misgendering and misnaming, the report concluded that "the policies and instructions on recording preferred names do not conform to the spirit of the 2012 Patrol Guide revisions." In addition, the report highlighted the ways that an inadequate complaint process exacerbates the problem, since the "NYPD's handling of complaints . . . makes it difficult for [it] to determine

---

[5] *See* National Coalition of Anti-Violence Programs, LESBIAN, GAY, BISEXUAL, TRANSGENDER, QUEER, AND HIV-AFFECTED HATE VIOLENCE IN 2016 at 67 (2017), available at
http://avp.org/wpcontent/uploads/2017/06/NCAVP_2016HateViolence_REPORT.pdf. 13 Id. 14 See New York City Civilian Complaint Review Board, PRIDE, PREJUDICE AND POLICING: An Evaluation of LGBTQ-Related Complaints from January 2010 through December 2015 at 4 (2016), available at
https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/20160630_lgbtq-report.pdf. 15 Id. at 6. 16 Available at https://www1.nyc.gov/assets/doi/press-releases/2017/nov/31_LGBTQ_ReportRelease_112117.pdf.
[6] *Id.*

patterns or trends that, if addressed, could lead to greater police accountability and ensure compliance with the Patrol Guide revisions."

61.     In 2018, The New York City Council introduced a host of bills that mandated sexual sensitivity and assault investigation training for members of the NYPD in the wake of information about the Department's treatment of sexual assault victims.[7] However, at a Council hearing in 2021, it was clear that these issues persisted.[8]

62.     In 2018, the Civilian Complaint Review Board (CCRB) announced that the scope of the problem of sexual misconduct including assault by members of the NYPD necessitated an expansion of CCRB rules to allow the independent oversight agency to investigate such complaints, and the CCRB Board adopted this change by unanimous vote in February 2018.[9] For decades the CCRB had referred all sexual misconduct cases to the NYPD's Internal Affairs Bureau (IAB), requiring victims of NYPD-related sexual abuse to interface entirely with the NYPD itself, and no information about any investigations, discipline, or outcomes were made public.

63.     The NYPD's Patrolmen's (also Police) Benevolent Association moved to block this CCRB expansion.[10] Ultimately, after reintroducing the proposed rules in a manner consistent with the First Department's holding in *Lynch v Civilian Complaint Review Board*,[11] the agency officially undertook these investigations December 2020. Plaintiffs incorporate by reference the

---

[7] *See* New York City Council (October 18, 2021) *Joint Hearing with Women and Equity and Public Safety*, minutes and video available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=896997&GUID=54E40D2E-C083-4B1B-AB17-1328C10A783E&Search=; *see* John del Signore, *NYPD Cop Accused of Groping His "Favorite Rape Victim,"* GOTHAMIST, January 16, 2015, *available at*: https://gothamist.com/news/nypd-cop-accused-of-groping-his-favorite-rape-victim.

[8] *Id.*

[9] New York City Civilian Complaint Review Board, NYC Civilian Complaint Review Board Votes Unanimously to Investigate Allegations of NYPD Sexual Misconduct, via Press Release (February 15, 2018) available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/news/pressreleases/2018/20181502_boardmtg_sexualmisconduct_release.pdf

[10] *Matter of Lynch v New York City Civilian Complaint Review Bd.*, 2020 NY Slip Op 03062 (1st Dept 2020).

[11] *Id.*

information contained in the Civilian Complaint Review Board's data regarding the agency's investigations.[12]

64.   According to information provided at the CCRB's public Board Meeting on December 8, 2021, between the time investigations were initiated and the presentation at the December 8th meeting, the CCRB had received 233 complaints within its jurisdiction that included 335 allegations of sexual misconduct by members of the NYPD, and had referred 384 sexual misconduct cases to the IAB and District Attorneys for potential employment and criminal actions.[13] Of these referred cases, 266 were considered "Phase II," meaning they involved serious misconduct such as sexual assault and groping a person over their clothing.[14] Misgendering a person and using homophobic language are grounds for CCRB complaints.

65.   At a public Board Meeting on September 9, 2020, CCRB Chair Fred Davies specifically stated that the agency "continues to receive complaints of NYPD's officers misgendering and belittling the civilians with homophobic slurs."[15] Chair Davies went on: "And we know that some New Yorkers, fueled by this very fear and pain, have called for removing the NYPD from queer spaces, like Pride, altogether. And one year after Layleen Polanco's death—tragic death—on Rikers Island, after rising violence against Black trans women nationwide, we

---

[12] New York City Civilian Complaint Review Board (December 8, 2021) *December 8, 2021 Public Board Meeting*, minutes available at:
https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/2021/Minutes/12082021_boardmtg_minutes.pdf
[13] December 8, 2021 CCRB Meeting Minutes at 25.
[14] New York City Civilian Complaint Review Board, *Memorandum Accompanying Public Vote* (February 14, 2018) available at:
https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/20181402_boardmtg_sexualmisconduct_memo.pdf
[15] New York City Civilian Complaint Review Board (September 9, 2021) *September 9, 2021 Public Board Meeting*, Meeting Minutes at 11, minutes available at:
https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/2020-meeting-minutes/20200909_boardmtg_minutes.pdf

come to this evenings conversation knowing that in talking about NYPD/LGBTQIA relations we're only scratching the surface in the conversation about the community's concerns."[16]

66.     At that same September 9, 2020 public meeting, Deborah Lolai, Supervising Attorney for the LGBT Defense Project at the Bronx Defenders, testified: "Our office has represented hundreds of LGBT people in criminal cases.. The NYPD has a record of abusing LGBT New Yorkers and, particularly, transgender, gender nonconforming, intersex and nonbinary people throughout history, which is a part of the reason CCRB collects this specific data. As a result of this pattern of abuse, the NYPD Patrol Guide was revised in 2012 to include protection for transgender people, specifically, who are arrested. Those revisions required the NYPD to offer most basic dignity to transgender people. For example, it requires that they respect people's names and pronouns, that they place them in holding cells consistent with their gender identity, it requires that they refrain from harassing them or using derogatory language towards them. But… I'm here to set the record straight about what happens on the ground in real life. **Out of the hundreds of transgender clients I have represented in criminal cases, there has not been one client whose arrest and treatment by the involved officer complied with these 2012 revisions**."[17]

67.     For example, in 2019, the New York Civil Liberties Union and Make the Road filed suit on behalf of Linda Dominguez, a transgender woman who was targeted for arrest by the NYPD while walking home and repeatedly misgendered while in police custody in 2018. *Dominguez v. City of New York et al.*, Index No. 020841/2019E (Bronx Co.) (2019).  Ms. Dominguez was also charged with false personation by the NYPD for using her true name rather than her deadname.

---

[16] *Id*.
[17] *Id*. at 79-80 (emphasis added).

68.     As part of the 2020 settlement agreement in *Dominguez*, the NYPD was to retrain its officers on the 2012 Patrol Guide provisions. A statement from the Law Department claimed: "The steps the NYPD will take in connection with this settlement reaffirm the Department's ongoing commitment to improving relations between the police and communities officers serve."[18]

69.     In another case, the Defendants City and NYPD were again sued for repeatedly misgendering Jamel Young, a transgender man who uses he/him pronouns, and abusing him because of his identity while he was in custody in 2019.[19]

70.     The NYPD has a well-documented history of intentionally misgendering even criminalizing the use of chosen names by gender nonconforming and transgender people. This and other abusive conduct by police is particularly directed at Black and brown trans, GNC, nonbinary, and queer people. Misgendering a person is a hostile, insulting, diminishing, and threatening act, and only more so in the context of power dynamics as radically different as those between a police officer and a person in their custody.

71.     Indeed, NYPD's historic abuse of and illegal discrimination against the LGBTQ New Yorkers is ***literally*** the origin of the modern Pride movement and parades:  it was an illegal, discriminatory raid at the Stonewall in, and following crackdown that led to (what the NYPD labeled as) the "riots" that the June observance of Pride commemorates worldwide.

72.     Courts have recognized misgendering as a serious violation, and "courts addressing the issue have almost uniformly fsound the practice hostile, objectively offensive, and degrading." *See Stanley v. City of N.Y.*, 71 Misc. 3d 171, 184 n.5 (N.Y. Cty. Sup. Ct. 2020), *citing*, *among*

---

[18] *See* Yasmine Khan, *NYPD Agrees to Settle Discrimination Lawsuit Brought By A Transgender Latina*, GOTHAMIST, November 12, 2020, available at https://gothamist.com/news/nypd-agrees-settle-discrimination-lawsuit-brought-transgender-latina.

[19] *See* Clarissa-Jan Lim, BUZZFEED NEWS, July 24, 2020, *A Black Trans Man Is Suing The NYPD And Correction Department For How They "Dehumanized" Him In Custody*, available at: https://www.buzzfeednews.com/article/clarissajanlim/black-trans-man-sued-nypd-treatment-in-custody

*other authority*, *Doe v City of New York*, 42 Misc. 3d 502, 976 NYS2d 360, 364 (N.Y. Cty.Sup.Ct.2013) (misgendering is "not a light matter, but one which is laden with discriminatory intent").

73.    However, Defendants have allowed a culture of gender- and sex-based abuse to persist.

**OTHER DOCUMENTS AND FACTS PLAINTIFFS INCORPORATE BY REFERENCE**

74.    Plaintiffs incorporate by reference the facts contained in the reports that have been issued concerning Defendants' responses to the summer 2020 protests, including, *inter alia,* the report issued by the New York City Corporation Counsel and the report issued by the New York City Department of Investigation.[20]

75.    Plaintiffs incorporate by reference the factual allegations in other federal civil rights complaints in cases pending in the United States District Court for the Southern District of New York arising from Defendants' responses to the summer 2020 protests:

    a.    *Sow et al v. City of New York et al,* 20-cv-00533(CM)(GWG);

    b.    *People of the State of New York v. City Of New York et al*, 21-cv-322 (CM)(GWG);

    c.    *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG);

    d.    *Sierra et al v. City of New York et al*, 20-cv-10291 (CM)(GWG);

    e.    *Wood v. De Blasio et al*, 20-cv-10541 (CM)(GWG);

    f.    *Yates v. City of New York, et al.,* 21-cv-01904 (CM)(GWG);

---

[20] Margaret Garnett, Commissioner, New York City Department of Investigation*, Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

    g.  *Campbell v. City of New York,* 21-cv-04056 (AJN); and

    h.  *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (Unassigned).

76.    Plaintiffs incorporate by reference the factual allegations in other federal civil rights complaints in cases pending in the United States District Court for the Eastern District of New York arising from Defendants' responses to the summer 2020 protests:

    i.  *Ezagui v. City of New York et al.*, 20-cv-06360 (DG)(SJB);

    j.  *Fraser v. City of New York et al.*, 20-cv-05741 (NGG)(MMH);

    k.  *Gelbard et al. v. City of New York et al*, 20-cv-03163(MKB)(RER);

    l.  *Jefferey et al. v. City of New York et al.*, 20-cv-02843 (NGG)(RML);

    m.  *Richardson and Myrie v. City of New York et al*., 21-cv-03609 (LDH)(SJB);

    n.  *Smith v. City of New York et al*., 21-cv-03096 (DG)(TAM); and

    o.  *Zayer v. City of New York et al.*, 20-cv-06070 (ARR)(PK).

## NYPD'S PERMISSIVE RESPONSE TO PRO-POLICE DEMONSTRATORS AT BOTH INDIVIDUAL RALLIES AND IN CASES OF COUNTER-PROTESTS AT SINGLE EVENTS

77.    The NYPD's violent response to protesters who were demonstrating against police brutality was dramatically different from their response to rightwing and pro-police protestors, including when interacting contemporaneously with people espousing different viewpoints about the police while at the same event.

78.    A pro-police "Blue Lives Matter" march was held on July 12, 2020 in Bay Ridge, Brooklyn. The march was also attended by counter-protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both

Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[21]

79.    The day before, on July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[22]

80.    In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[23]

81.    On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[24]

---

[21] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, GOTHAMIST, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.

[22] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, GOTHAMIST, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.

[23] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, GOTHAMIST, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.

[24] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

82.    On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her and police threw her to the ground.[25]

83.    On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[26],[27]

84.    The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present.  For example, but without limitation:

   a.   In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

   b.   In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[28],[29]

   c.   More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a

---

[25] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges,* GOTHAMIST, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

[26] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[27] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

[28] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson

[29] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/

mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence, but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[30] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[31]

### THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS

85.     The violations suffered here by Plaintiffs are at the common intersection of the NYPD's long history of permitting sexual misconduct by its members and its long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, *inter alia*, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

86.     The NYPD response to the protests in New York City the summer of 2020 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, such as its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force including sexual abuse, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

87.     For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray, riding horses into crowds and batons strikes

---

[30] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video

[31] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, GOTHAMIST, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

to disperse protestors, and kettling to move protestors from specific locations to effectuate mass arrests.[32]

88.     The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of kettling tactics, excessive force and mass arrests, and excessive and unreasonable detention.[33]

89.     The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[34]

90.     Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers, as well as widespread sexual misconduct alleged by protestors and kettling tactics to move protestors or initiate mass arrests.[35]

91.     Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

92.     Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, sexually abused while demonstrating, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as has the Plaintiffs in this case.

93.      In many of these cases Defendants employed tactics developed and modified over the course of many years by Defendants Shea, Monahan, and their predecessors and by other

---

[32] See, e.g., N.Y. Civil Liberties Union, Arresting Protest (2003), available at https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[33] See, e.g., N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[34] See, e.g., Callaghan v. City of New York, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[35] See People of the State of New York v. City of New York et al., 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

a.   *Mandal v. City of New York.,* 02-cv-1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment-based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b.   *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c.   *Allen v. City of New York*, 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d.   *Haus v. City of New York*, 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject

arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

e.   *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest;

f.   *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz*, 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g.   *Callaghan v. City of New York*, 07-cv-9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

h.   *Osterhoudt v. City of New York, et al.*, No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and

in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i.      Despite then-Mayor Michael Bloomberg's recognition that "the majority of the [OWS] protesters have been peaceful and responsible,"[36] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j.      In *Peat v. City of New York,* No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[37] encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

k.      Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

l.      The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F.Supp.3d 313 (SDNY 2019);

m.      The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that

---

[36] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

[37] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protester activity and engaging in a manner to obstruct protester's ability to engage in First Amendment activity and identified how executive "supervising officers, at random and without warning, pointed to protesters they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." https://www.nyclu.org/en/nyc-free-speech-threat-assessment.

is alleged in this pleading, including, failure to provide reasonable dispersal orders and opportunity to disperse, unnecessary and excessive force used on protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC*, 12-cv-5482(RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n.  Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case, Peat,* the Union Square Litigations, as well *as* several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

o.  The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled *Arresting Protest*, published April 2003, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protest.pdf;

p.  The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*, published in 2005, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

q.  The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r.  *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

## THE NYPD'S FAILURE TO TRAIN REGARDING PROTEST POLICING

94.  Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

95.     In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

96.     In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

97.     Upon information and belief, to this day, that document forms the core the NYPD protest response-related training.

98.     The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

99.     Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

100.    These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of the Plaintiffs in this case.

101.    Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

102.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

103.    On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

104.    Defendants' failures to train, which contributed to violations of Plaintiffs' rights in this case, include, *inter alia,* the following:

a.    The failure to train, instruct, and discipline officers to discourage and prevent sexual abuse, misconduct, and assault by NYPD members.

b.    The failure to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

c.    The failure to make clear the need for individualized probable cause to arrest in a protest context;

d.    The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

e.    The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters; and

f.    The failure to provide training on the importance and need for NYPD members to wear masks during the COVID-19 pandemic, to provide masks for arrestees, and to allow arrestees to engage in mask-wearing, social distancing, handwashing, and other, similar safety measures in light of the COVID-19 pandemic.

**DEFENDANTS' HISTORICAL FAILURES TO MONITOR AND SUPERVISE NYPD MEMBERS' PROTEST POLICING**

105.    Although Defendants City, de Blasio, Shea, Monahan, and other policymakers actually knew, or should have known, that NYPD members were engaging in or had engaged in

the unconstitutional conduct complained of herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged in, or observed such conduct.

106.    For example, despite statements made by Defendants de Blasio and Shea in the media indicating they had knowledge of events related to violence and mass arrests at the protests as they were unfolding, and the wealth of video and other evidence that has been widely available in the intervening months, upon information and belief, virtually no NYPD members have been meaningfully investigated or disciplined related to their conduct.

### STATE AND CITY OFFICIAL REPORTS ON PROTESTS SINCE 2020

107.    In July 2020, the New York State Office of the Attorney General (the "AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").[38]

108.    The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

109.    The AG Report also found the pervasive failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

110.    In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").[39]

---

[38] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf. The Plaintiffs herein incorporate by reference into this case the facts set forth in the AG Report.
[39] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at

111.    The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[40]

112.    In addition to noting the heavy-handed response by the Strategic Response Group (SRG) at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[41]

113.    The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

114.    The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

115.    The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

116.    According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[42]

117.    The DOI also found that Black arrestees were disproportionately charged with felonies.[43]

---

https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

[40] *Id.* at 36.
[41] *Id.* at 61.
[42] *Id.* at 26.
[43] *Id.* at 27.

118.     The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[44]

119.     According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[45]

120.     Defendant City and NYPD leadership and policymakers knew the Department and its officers had problems with constitutionally policing protests but failed to adequately train and otherwise prepare its officers to respond to the 2020 protests, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

121.     It is clear that these problems persist.


**FIRST CLAIM FOR RELIEF**

**Unlawful Seizure**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution***

122.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

123.     Defendants' seizure of the Plaintiffs herein was done without any judicial warrant authorizing them to seize any Plaintiff, was unreasonable, and was done without privilege or lawful justification.

124.     Plaintiffs did not consent and were conscious of their confinement by Defendants.

---

[44] DOI Report at 56.
[45] *Id.* at 28.

125.    Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiffs.

126.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

127.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Force

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

128.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

129.    Defendants' use of force against Plaintiffs was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

130.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

131.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

### First Amendment

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution***

132.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

133.    Defendants (a) imposed restrictions on such protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in unlawfully seizing Plaintiffs, in subjecting Plaintiffs to excessive force, in selectively enforcing laws and regulations against Plaintiffs, in subjecting Plaintiffs to Defendants' protest policing policies, and in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

134.    In addition to being retaliatory, the restrictions Plaintiffs complain of herein, which Defendants imposed upon Plaintiffs' First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiffs' protected conduct that:

a.    Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

b.    Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiffs' protected expression, including in that Plaintiffs' abilities to communicate effectively were threatened; and/or

c.    Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d.      Amounted to the imposition of strict liability on Plaintiffs for engaging in protected speech and/or expression.

135.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

136.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

### First Amendment Retaliation

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution*

137.    Defendants retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment.

138.    Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected speech and/or conduct.

139.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

140.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

141.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiffs to violations of her First Amendment rights.

142.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

143.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiff.

144.    Upon information and belief, Defendants did not subject other protesters expressing "Blue Lives Matter" or other, similar, pro-police messages who were similarly situated to Plaintiffs in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

145.    Plaintiffs suffered actual chill, including in that Plaintiffs were prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

146.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in detaining and assaulting Plaintiffs subjected Plaintiffs to the violations of their First Amendment rights described elsewhere herein.

147.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

148.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

### Due Process

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution***

149.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

150.    As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiffs violated their Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

151.    Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing Plaintiffs and subjected Plaintiffs to the violations of their Due Process rights described elsewhere herein.

152.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

153.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SIXTH CLAIM FOR RELIEF

### Equal Protection and Selective Enforcement

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fourteenth Amendment to the United States Constitution***

154.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

155.    As discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in detaining Plaintiffs thus subjected Plaintiffs to the above-described violations of Plaintiffs' Equal Protection rights.

156.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

157.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SEVENTH CLAIM FOR RELIEF

**Municipal Liability**

***Pursuant to 42 U.S.C. 1983 and***
***<u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978)***
***for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, and Fourteenth***
***Amendments to the United States Constitution***

158.    Plaintiffs hereby incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

159.    The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiffs to, including, but not limited to: uses of excessive force, and sexual battery, and unlawful detention, and unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning; employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning; engaging in retaliatory and selective enforcement of the criminal laws against perceived participants in First Amendment assemblies, particularly Black Lives Matter and/or anti-police brutality protests, in the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations as to their perceived violations, without fair warning.

160.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendant de Blasio, Defendant Shea, and Defendant Monahan; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, Defendant de Blasio, Defendant Shea, Defendant Monahan, and other

policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

### EIGHTH CLAIM FOR RELIEF

**U.S.C. 1983 and State Claims for Malicious Prosecution (Plaintiff Brandon)**

161.   Plaintiffs hereby incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

162.   The individual Defendants willfully and intentionally fabricated evidence by falsely memorializing claims to have witnessed Plaintiff BRANDON engaging in criminal or unlawful activity, and then forwarded these materially false claims to the New York County District Attorneys Office in order to justify the arrest of Plaintiff, and to justify, bring about, and cause them to be deprived of their liberty and to be criminally prosecuted.

163.   By so doing, the individual Defendants subjected Plaintiff Brandon to malicious prosecution and denial of a fair trial and violation of his right to due process by fabricating evidence and otherwise providing prosecutors with a materially false and misleading version of events, and thereby violated their rights under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

164.   These actions caused Plaintiff Brandon to suffer the deprivation of his liberty, loss of his constitutional rights, physical injuries, and mental anguish.

## NINTH CLAIM FOR RELIEF

### False Arrest (Plaintiff Brandon)

165.    Plaintiffs hereby incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

166.    The individual Defendants willfully and intentionally seized, searched, detained, and arrested Plaintiff BRANDON, and caused them to be imprisoned, without probable cause, and without a reasonable basis to believe such cause existed.

167.    Plaintiff had not been engaged in any criminal conduct, nor was Plaintiff engaged in any conduct that could reasonably be viewed as criminal nor a basis to justify his arrest.

168.    Despite the absence of sufficient legal cause, Plaintiff Brandon was arrested and jailed.

169.    By so doing, the individual Defendants subjected Plaintiff Brandon to false arrest and imprisonment, and thereby violated and aided and abetted in the violation of their rights under the Fourth Amendment of the United States Constitution.

## TENTH CLAIM FOR RELIEF: STATE LAW CLAIMS

### Violations of New York State Law

### *Pursuant to the New York State Constitution and New York State Common Law*

170.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

171.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking

state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

**Violations of the New York State Constitution**

172.    Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

173.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

**Assault and Battery**

174.    Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

175.    Defendants committed battery within the meaning of New York common law against Plaintiffs by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

176.    Defendants did thereby inflict assault and battery upon the Plaintiffs.

**False Imprisonment and Unreasonable Detention**

177.    By the actions described above, the police officials described above did falsely detain Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiffs were conscious of the confinement and it was without their consent.

**Intentional and Negligent Infliction of Emotional Distress**

178.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

179.    By the actions described above, Defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiffs.

180.    The acts and conduct of the Defendants were the direct and proximate cause of injury and damage to the Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

181.    As a result of the foregoing, Plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured

**Negligent Training and Supervision**

182.    Upon information and belief, Defendant City supervised and trained the police officials described above.

183.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Discrimination in Violation of the New York State and City Human Rights Law**

184.    Plaintiffs re-allege all preceding paragraphs as if fully set forth herein.

185.    As set out above, Defendants violated New York State and City Civil Rights Law.

186.    Further, the New York City Commissioner on Human Rights has also issued official enforcement guidance on "Gender Identity/Gender Expression," available at https://www1.nyc.gov/site/cchr/law/legal-guidances-gender-identity-expression.page  That guidance provides, in relevant parts:

"Gender discrimination is prohibited in employment, housing, public accommodations, discriminatory harassment, and bias-based profiling by law enforcement and exists when a person is treated 'less well than others on account of their gender.'"

Id., at Part III, citing Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 39 (1st Dep't 2009).

"The NYCHRL *requires employers and covered entities to use the name, pronouns, and title* (e.g., Ms./Mrs./Mx.) with which a person self-identifies, *regardless of the person's sex assigned at birth, anatomy, gender, medical history, appearance, or the sex indicated on the person's identification*."

Id. at Part III(1) (emphasis added).

187.    Defendants persistently and deliberately used the wrong language to refer to Plaintiff.

188.    The guidance also provides, as "Examples of Violations," among other things, "Intentional or repeated refusal to use a person's name, pronouns, or title," which should cease when a person, "has made clear" what name or pronouns should be used.  *Id.*

189.    That happened here, and yet, the conduct described above did not cease.

190.    The City, upon information and belief, lacks the policies and trainings required to prevent violations of the kind Plaintiff experienced

191.    Defendants' actions violate the New York State Human Rights Law, Executive Law § 296.

**Discrimination in Violation of the New York State and New York City Civil Rights Law**

192.    Plaintiffs re-allege all preceding paragraphs as if fully set forth herein.

193.    The Defendants' actions violate the New York State Civil Rights Law § 40-c.

**Bias-Based Profiling in Violation of the New York City Community Safety Act**

194.    Plaintiffs re-alleges all preceding paragraphs as if fully set forth herein.

195.    Defendants' actions violate the New York City Community Safety Act, New York City Code § 14-151.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

## CONCLUSION AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs demand judgment against the individual Defendants and the City of New York as follows:

i.    Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.   Actual damages in an amount to be determined at trial against the City of New York;

iii.  Systemic injunctive relief sufficient to cure the City and the NYPD's persistent discriminatory practices;

iv.   Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988 and New York State and City Civil Rights and Human Rights law, and New York common law; and

v.    Such other relief as the Court deems just and proper.

Dated: New York, New York
       April 15, 2022

                              COHEN&GREEN P.L.L.C.


                    By:    _____
                              Elena L. Cohen
                              J. Remy Green

Jessica Massimi
MK Kaishian

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
t: (929) 888-9480
f: (929) 888-9457
e: elena@femmelaw.com
remy@femmelaw.com
jessica@femmelaw.com

**GIDEON ORION OLIVER**

277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
e:  Gideon@GideonLaw.com